UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA                          **REPORT**
                                                         **and**
                    v.                             **RECOMMENDATION**

          AARON OWENS,                             **06-CR-072A(F)**

                         Defendant.

_____

APPEARANCES:          TERRANCE P. FLYNN
                      United States Attorney
                      Attorney for the Government
                      MARYELLEN KRESSE
                      Assistant United States Attorney, of Counsel
                      Federal Centre
                      138 Delaware Avenue
                      Buffalo, New York 14202

                      JOSEPH B. MISTRETT
                      Federal Public Defender
                      Attorney for Defendant
                      MARIANNE MARIANO
                      Assistant Federal Public Defender, of Counsel
                      300 Pearl Street
                      Suite 450
                      Buffalo, New York 14202

## JURISDICTION

This case was referred to the undersigned by Honorable Richard J. Arcara on

July 5, 2006.  The matter is presently before the court on Defendant's motion to

suppress DNA evidence (Doc. No. 15), filed August 14, 2006.


## BACKGROUND

Defendant Aaron Owens ("Defendant") is charged in an indictment returned on

March 7, 2006 ("the Indictment") with a single count of bank robbery in violation of 18

U.S.C. § 2113(a).  Specifically, the Indictment alleges that on March 26, 2003,

Defendant robbed a bank located at 529 Elmwood Avenue, Buffalo, New York.

Defendant was arraigned on the Indictment on March 28, 2006.

On August 14, 2006, Defendant filed the instant motion seeking to suppress DNA

evidence[1] and requesting a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 155-

56 (1978) (requiring a hearing where a defendant "makes a substantial preliminary

showing that a false statement knowingly and intentionally, or with reckless disregard

for the truth, was included by the affiant in the warrant affidavit and . . . the allegedly

false statement is necessary to the finding of probable cause.") ("a *Franks* hearing").

The motion was supported by an attached Memorandum in Support of Suppression of

DNA Evidence ("Defendant's Memorandum"), and Defendant's Exhibits A through F

("Defendant's Exh(s). __").  The Government's Memorandum of Law in Opposition to

Defendant's Motion to Suppress DNA Evidence was filed on August 31, 2006 (Doc. No.

16).  On September 15, 2006, Defendant filed the Reply Affirmation of Assistant Federal

Public Defender Marianne Mariano (Doc. No. 17) ("Mariano Affirmation"), along with

Defendant's Reply Exhibits A through D ("Defendant's Reply Exh(s). __").  The

Corrected Government's Memorandum of Law in Opposition to Defendant's Motion to

Suppress DNA Evidence was filed on September 18, 2006 (Doc. No. 18)

("Government's Memorandum"), attached to which are Government Exhibits 1 through 3

("Government Exh(s). __").[2]

---

[1] Deoxyribonucleic acid is typically abbreviated as "DNA."

[2] Except for the attachment of the Government's Exhibits to the Government's Response (Doc.
No. 18), filed September 18, 2006, the Government's Response is otherwise identical to the Government's

On September 18, 2006, the Government moved for leave to file a sur-reply (Doc. No. 19), and that request was granted the same day (Doc. No. 20).  Accordingly, on September 25, 2006, the Government's Sur-Reply in Opposition to Defendant's Motion to Suppress DNA Evidence (Doc. No. 21) ("Government's Sur-Reply"), was filed.

At oral argument, conducted on September 28, 2006, the undersigned invited the parties to file additional papers regarding the suppression issue and ordered the Government to file an affidavit describing the manner in which the subject DNA evidence was obtained from Defendant.  September 28, 2006 Minute Entry (Doc. No. 22).  The Government's Supplemental Submission Relative to Defendant's Motion to Suppress DNA Evidence (Doc. No. 24), consisting of the Affidavit of Federal Bureau of Investigation ("FBI") Special Agent James N. McCaffrey ("Agent McCaffrey Affidavit") was filed on October 20, 2006.  No further papers regarding the DNA issue were filed.

Based on the following, Defendant's motion to suppress evidence should be DENIED without a Franks hearing.

## **FACTS**[3]

As noted, on March 26, 2003, a commercial bank located at 529 Elmwood Avenue, in Buffalo, New York ("the bank") was robbed by a man who approached the service counter in the bank, handed a bank teller ("the victim teller") a note demanding money and instructed the victim teller not to place a dye pack with the money.

---

Memorandum of Law in Opposition to Defendant's Motion to Suppress DNA Evidence, filed August 31, 2006 (Doc. No. 16).

[3] Taken from the motion papers filed in this action.

3

Redacted FBI 302 form dated March 26, 2003 and containing the victim teller's statement, Defendant's Exh. A ("Victim Teller's Statement").  According to the teller, the bank robber was wearing a dark gray sweatshirt with the hood pulled up over his head and "appeared to have some very heavy items in the center pocket of his sweatshirt," although the victim teller could not see inside the sweatshirt.  Victim Teller's Statement. The victim teller activated the bank's security camera and handed the bank robber money consisting of twenty-dollar bills, along with serialized "bait bills" and a dye pack, and the bank robber quickly walked out of the bank.  Victim Teller's Statement.  The victim teller described the bank robber as a black male in his mid 20s, with black hair, brown eyes, medium dark skin, a round face, standing 5' 8" tall, weighing 135 to 140 pounds, with a "very slim" build, not well groomed and with no significant accent but who "sounded like a street kid."  *Id*.  The victim teller positively identified the bank robber from the bank's video tape system, *id*, which shows the robber wearing a dark gray pull-over hooded sweatshirt.  Affidavit of Assistant United States Attorney Mary Ellen Kresse in Support of Motion for Order Authorizing Taking of DNA Sample, Defendant's Exh. D; Government's Exh. 1 ("Kresse Affidavit"), ¶ 6.  Another bank teller who witnessed the robbery ("the witness teller") described the bank robber as a black male in his mid 20s, with black hair, dark brown eyes, visible cheek bones, a round face, no facial hair, acne or razor burn, 5' 7" to 5' 8" tall, "very thin" build, with a deep, clear voice, and wearing a gray hooded sweatshirt.  Redacted FBI 302 form dated March 26, 2003 and containing the witness teller's statement, Defendant's Exh. B ("Witness Teller's Statement").

      After exiting the bank, the bank robber fled the scene in a taxi cab in which a

female companion was waiting.  Kresse Affidavit ¶ 4.  While inside the cab, the dye pack exploded, obscuring the vision of the cab driver who pulled over to the side of Elmwood Avenue.  *Id*.  The bank robber and his female companion then fled the cab and ran down Lexington Avenue, an adjoining residential street.  *Id*.

Following the bank robbery, another witness provided the FBI agents investigating the robbery with a license plate number belonging to a vehicle in which the bank robber possibly fled.  The plate number belonged to a taxi cab company, and the driver of the cab was identified as Richard Collier ("Collier") who stated that he drove a black male and his female companion to the bank on March 23, 2006 and waited while the man entered the bank.  Upon exiting the bank and reentering the cab, the man instructed Collier to drive toward Oxford Street, a local residential street, which Collier did.  After driving a short distance, the cab filled with smoke from the exploding dye pack, and the passengers fled the cab.  Collier threw the remainder of the dye pack into the cab's trunk. The dye pack and some bait bills were later retrieved from the trunk and the serial numbers on the recovered bait bills matched the serial numbers on the bills recorded by the bank as placed in the bait pack by the victim teller.

The FBI agents then followed the path from the cab reportedly taken by the bank robber and his female companion after the dye pack exploded.  On March 27, 2003, a dark gray pull-over hooded sweatshirt and black T-shirt were found abandoned behind a gas station ("the gas station") located at the corner of Lexington and Elmwood Avenues. *Id*. ¶ 5.  Red dye was visible on the front of the sweatshirt, near the front pocket.  *Id*.

Four latent fingerprints from the counter of the victim teller's window were recovered at the bank and submitted for fingerprint analysis.  April 4, 2003 Erie County

Central Police Services Memorandum, Defendant's Exh. C from State Automated

Fingerprint Identification System ("SAFIS") Manager Linda Tarnawskyj ("Tarnawskyj") to

FBI Special Agent Michael Ponicki ("Agent Ponicki") ("SAFIS Manager Tarnawskyj

Memorandum").  According to Tarnawskyj, after the fingerprints were lifted, they were

entered into the SAFIS, and the results for the print obtained from the victim teller's

window counter showed a "possible" match to Defendant.  SAFIS Manager Tarnawskyj

Memorandum.  No positive identification could be made as to two other suspects

identified by the investigators, nor could prints be obtained from Deshawn Houston,

another subject offered for comparison.  *Id*.  Tarnawskyj stated that the "tentative

identification" of Defendant based on the counter print "should be reviewed and

confirmed by a qualified latent examiner."  *Id*.  No such examination has been made.

The demand note the bank robber handed to the victim teller was also submitted for

fingerprint analysis, which revealed a few latent fingerprints to which no comparison

could be made.  *Id*. [4]

On August 25, 2003, the Government, based on the recovery of the sweatshirt

and T-shirt and the fingerprint analysis, sought, from Chief Judge Arcara, a court order

---

[4] According to Defendant, the Government falsely advised defense counsel that no latent
fingerprints were obtained from the demand note.  Mariano Affirmation at 2.  Specifically, Ms. Mariano
maintains that at the July 26, 2006 court appearance, prior to filing the instant motion, she was "told that
latent fingerprints were found on the demand note, but that the process of identifying them required the
spraying of a substance on the note, thus destroying the prints themselves; in other words, the prints were
found, but they were not properly preserved."  *Id*.  In contrast, by letter dated August 15, 2006, Assistant
United States Attorney Kresse informed Ms. Mariano that no prints were found on the demand note. *Id*.;
Defendant's Reply Exh. B.  According to the Erie County Central Police Services laboratory report,
however, no comparison could be made between Deshawn Houston's prints and the "latent [print] on the
demand note."  Defendant's Reply Exh. C (bracketed text added). Further, according to an Evidence Case
Report dated March 27, 2003, Detective Paula Carducci checked the demand note which had been
processed the previous day, and discovered a few latent prints that were secured to be turned over to
Defendant with other evidence to the FBI upon request.  Defendant's Reply Exh. D.

to obtain DNA evidence from Defendant by buccal swab, *i.e.*, a swab of the inside of Defendant's cheek to obtain a sample of Defendant's saliva.  Submitted in support of the motion were the Kresse Affidavit and a Memorandum of Law in Support of Motion for Order Authorizing Taking of DNA Sample.  Government's Exh. 2 ("DNA Memorandum").  In this submission, the Government stated that the latent fingerprint from the victim teller's window counter "was determined to belong to [Defendant] Aaron Owens," Kresse Affidavit ¶ 7; *see* DNA Memorandum at 2 ("That fingerprint was determined to belong to an individual by the name of Aaron Owens"),  and that Defendant "meets the description of the bank robber given by the victim teller, namely a black male in his mid-twenties, of similar height and weight."  Kresse Affidavit ¶ 8; *see* DNA Memorandum at 2 (stating same).  As such, the Government maintained there was "reasonable individualized suspicion" to believe Defendant is the bank robber, Kresse Affidavit ¶ 11, and that only "reasonable individualized suspicion," rather than probable cause, was necessary for the requested court order.  DNA Memorandum at 6-7.  The Government stated to the court that Defendant was then being held in the Erie County Holding Center ("the Holding Center") in Buffalo, New York on unrelated state criminal charges.  Kresse Affidavit ¶ 9; DNA Memorandum at 2.  The Government sought to obtain two buccal swabs from inside Defendant's cheek to compare Defendant's DNA to any DNA sample obtained from the clothing found behind the gas station following the robbery.  Kresse Affidavit ¶ 10.

Based on the Government's submissions, on September 3, 2003, Chief Judge Arcara issued an order requiring Defendant to provide a DNA sample to the FBI in the form of buccal swabs.  September 3, 2003 Order, Government's Exh. 3 ("the DNA

Order").  In accordance with the DNA Order, on October 30, 2003, FBI Special Agent

James N. McCaffrey and another, unidentified, FBI agent traveled to the Livingston

State Correctional Facility ("Livingston"), where Defendant was then incarcerated, and

were taken to an interview room.  Agent McCaffrey Affidavit ¶ 3.  Defendant was

escorted into the room by a corrections officer who waited outside the interview room's

closed door.  *Id*. ¶ 3.  After the FBI agents identified themselves to Defendant, Agent

McCaffrey presented Defendant with the DNA Order, explaining the agents intended to

take a DNA sample from Defendant because Defendant was a suspect in a bank

robbery in Buffalo.  *Id*. ¶ 4.  Agent McCaffrey explained to Defendant the procedure by

which Defendant's DNA sample would be obtained, including that Agent McCaffrey

would rub a cotton swab on the inside of Defendant's cheek.  *Id*.  Agent McCaffrey

maintains that Defendant did not object to the taking of the buccal swabs, *id*., and

Defendant has not argued otherwise.

After explaining the DNA sample taking procedure to Defendant, Agent

McCaffrey proceeded to rub one cotton swab on the inside of Defendant's left cheek,

placed the swab into a swab container, and then rubbed a second cotton swab on the

inside of Defendant's right cheek and placed the second swab into a swab container.

Agent McCaffrey Affidavit ¶ 5.  The corrections officer then escorted Defendant from the

interview room.  *Id*.  According to Agent McCaffrey, the entire DNA sample collection

process took ten minutes.  *Id*. ¶ 6.  Ageny McCaffrey forwarded the buccal swabs to

Agent Ponicki in Buffalo.  *Id*. ¶ 7.

The buccal swabs were received in the FBI Laboratory in Quantico, Virginia, on

December 3, 2003.  Defendant's Exh. F.  According to the FBI Laboratory analysis, the

DNA taken from Defendant on the buccal swabs was compared to the DNA found on

the sweatshirt and T-shirt that were retrieved by the Agents, and showed Defendant

was a contributor to the DNA on the sweatshirt, and a potential contributor to the DNA

on the T-shirt. *Id*.

## DISCUSSION

Defendant seeks to suppress the DNA evidence, arguing that its seizure through

buccal swabs constitutes a bodily intrusion for which the Fourth Amendment requires

probable cause. Defendant's Memorandum at 5-6. As such, according to Defendant,

the Government's assertion to Judge Arcara that the requisite degree of justification for

a buccal swab is "reasonable individualized suspicion," rather than "probable cause,"

establishes that the requisite probable cause to support the DNA Order was lacking. *Id*.

at 6-7. In opposition to Defendant's motion the Government asserts that although

some courts have required probable cause to support a court order to obtain a DNA

sample from a criminal suspect, other courts require a lesser showing, *i.e.*, reasonable

individualized suspicion, which, in the instant case, was established. Government's

Memorandum at 7-9. The Government also disputes Defendant's characterization of

the evidence submitted in support of the DNA Order as knowingly false and presented

with reckless disregard for the truth. *Id*. at 9-13.

## 1.      Consent to Search

Preliminarily, although not argued by the parties, the court has considered

whether Defendant consented to the taking of his DNA evidence by buccal swab,

thereby rendering any need, assuming, *arguendo*, the buccal swabs constituted a search, for a search warrant or the DNA Order moot.  A search conducted pursuant to consent is a recognized exception to the warrant requirement.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).  "So long as the police do not coerce consent, a search conducted on the basis of consent is not an unreasonable search."  *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995).  It is the prosecution's burden to establish that consent was voluntarily given.  *Schneckloth*, *supra*, at 222.  Whether a consent to a search was voluntarily given or was the product of duress or coercion, either express or implied, is a question of fact to be determined based on the totality of all the circumstances.  *Id*. at 227.  Consent need not be expressed in any particular form and may be found based on an individual's words, actions, or conduct.  *United States v. Duetsch*, 987 F.2d 878, 883 (2d Cir. 1993).  Nevertheless, the government's burden is not satisfied by establishing a mere acquiescence in a showing of lawful authority.  *Florida v. Royer*, 460 U.S. 491, 497 (1983) (holding police officers exceeded limits of an investigatory stop by asking defendant to accompany them to a small police room, and retaining defendant's driver's license and airline ticket, thereby indicating defendant was not free to leave).

In the instant case, Defendant does not contend that his cooperation in taking the buccal swabs was other than voluntary, yet the Government offers nothing establishing that Defendant did not merely acquiesce in the Government's show of authority based on the DNA order.  In particular, although Agent McCaffrey maintains that Defendant did not object to the taking of the buccal swabs, Agent McCaffrey Affidavit ¶ 4, the totality of the circumstances surrounding the taking of such buccal swabs begs the question as to

whether Defendant was merely acquiescing in the FBI Agents' show of authority.  Such circumstances include the fact that Defendant, while incarcerated at Livingston, was escorted by a corrections officer to an interview room where Agent McCaffrey and another, unidentified, FBI agent, prior to requesting Defendant's cooperation in obtaining the swabs, advised Defendant of the DNA Order directing the taking of Defendant's DNA sample by buccal swabs.  Meanwhile, the corrections officer who had escorted Defendant to the interview room waited outside the room's closed door.  The totality of these circumstances supports a finding that Defendant, by  complying with the buccal swab procedure was, in actuality, merely acquiescing in the FBI Agents' show of authority.  As such, the record fails to establish that Defendant consented to the taking of his DNA sample.  Had the agents obtained Defendant's explicit affirmative nod or written consent to the taking of the swabs, without reliance on the DNA Order, the result may well be different.

**2.      Showing Necessary and Means Used to Obtain DNA Sample**

The court next addresses the requisite showing necessary for a court order authorizing the taking of a DNA sample from a suspect.  Defendant maintains that such an order is subject to the Fourth Amendment's constraints and requires probable cause, Defendant's Memorandum at 5-6, while the Government maintains that no more than reasonable individualized suspicion is sufficient, Government's Memorandum at 7-9. Preliminarily, the court observes that most of the decisions addressing the taking a DNA sample from a criminal suspect have relied on cases interpreting the Fourth Amendment's applicability in obtaining non-DNA evidence, such as blood (for type or

substance content) or fingerprints (for identification).  Such reliance, however, fails to acknowledge relevant differences between blood and fingerprint evidence and DNA evidence, critical to the analysis.  Accordingly, some basic information regarding DNA evidence is necessary to the analysis of the issues presented.

The procedures by which potential evidence derived from DNA is used for identification are based on principles of human genetics originally developed by molecular biologists to determine the genes responsible for a variety of inherited diseases.  Thomas M. Flemming, Annotation, Admissibility of DNA Identification Evidence, 84 A.L.R. 4th 313 at § 2[a] (1991).  DNA testing, which is performed both by law enforcement as well as in commercial laboratories has been used to (1) link a person to, or to exonerate a wrongly accused suspect of, a crime where biological evidence has been left at the crime scene; (2) resolve disputed parentage in paternity, immigration and other cases; and (3) identify human remains.  *Id*.  DNA enables such determination because "[n]o two people share the same DNA type except for identical twins."  DNA Untwisted, San Francisco Daily Journal, Apr. 20, 1995, *available at* http://www.forensicsdna.com/DNA_Untwisted.htm; *See id*. § 2[c].  Furthermore, a person's DNA is the same in every cell in the body, and remains the same throughout the person's life.  *Id*.  Thus, DNA evidence, if correctly analyzed, is highly reliable and probative.

Unlike blood samples and fingerprints, DNA evidence is distinguishable from other evidence insofar as it is readily and involuntarily separated from the human body; specifically, DNA evidence may be obtained and analyzed from various sources, including blood and bloodstains, semen and semen stains, buccal swabs, saliva, urine,

hair, skin or body tissues, bones and teeth.  DNA Examinations, *available at*

http://www.fbi.gov/hq/lab/handbook/intro6.htm.  Other items from which DNA evidence

may be recovered are articles of clothing, cigarette butts, chewing gum, envelopes,

stamps, and teeth.  *Id*.  DNA samples may also be surreptitiously obtained in a variety

of ways, including from a used drinking glass, a scraping from a doorknob to a person's

home, a hair clipping from a hair cut, or a hair released during combing or brushing

one's head.  Randall Parker, Genetic privacy: can it be protected?, Sept. 20, 2002,

*available at* http://www.futurepundit.com/archives/000039.html.  In fact, the relative ease

with which a DNA sample may be obtained renders questionable the ability to

realistically protect any genetic privacy interest as increased access to DNA sequencing

machines, which can make valid DNA comparisons, makes the cost of obtaining a DNA

sequencing for a given sample more cost-effective.  *Id*.  Bearing these facts in mind, the

court considers whether the Fourth Amendment applies to the taking of a DNA sample

for sequencing analysis.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their

persons, houses, papers, and effects, against unreasonable searches and seizures. . .

."  U.S. Const. amend. IV (underlining added).  *See also Arizona v. Evans*, 514 U.S. 1,

10 (1995) ("The Fourth Amendment states that '[t]he right of the people to be secure in

their persons, houses, papers, and effects, against unreasonable searches and

seizures, shall not be violated, . . . .'") (quoting U.S. Const. amend. IV).  This

fundamental right "may not be violated, and no warrants shall issue, but upon probable

cause, supported by oath or affirmation, and particularly describing the place to be

searched or the thing to be seized."  U.S. Const. amend. IV.  "The integrity of an

individual's person is a cherished value of our society."  *Schmerber v. California*, 384

U.S. 757, 772 (1966).

Nevertheless, it is axiomatic that "[t]he Fourth Amendment is a vital safeguard of

the rights of the citizen to be free from any *unreasonable* governmental intrusions into

any area in which he has a reasonable expectation of privacy."  *Winston v. Lee*, 470

U.S. 753, 767 (1985) (italics added).   "[I]t goes without saying that the Fourth

Amendment bars only unreasonable searches and seizures."  *Maryland v. Buie*, 494

U.S. 325, 331 (1990).  *See Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992) ("It is

fundamental that persons are protected from *unreasonable* searches and seizures by

the fourth amendment and that this right is enforceable against the states through the

fourteenth amendment.") (italics added).  As such, at a minimum, the Fourth

Amendment's "constraint on government conduct generally bars officials from

undertaking a search or seizure absent individualized suspicion."  *City of Indianapolis v.*

*Edmond*, 531 U.S. 32, 37 (2000) (citing *Chandler v. Miller*, 520 U.S. 305, 308 (1997)).

"The overriding function of the Fourth Amendment is to protect personal privacy

and dignity against unwanted intrusion by the State."  *Schmerber*, *supra*, at 767.

Accordingly, there are many instances in which obtaining personal information have

been held not to raise Fourth Amendment issues.  *See*, *e.g.*, *Cupp v. Murphy*, 412 U.S.

291, 295 (1973) (permitting a warrantless obtaining of under fingernail scraping, and

characterizing fingerprints as "mere physical characteristics" which are "constantly

exposed to the public."); *United States v. Dionosio*, 410 U.S. 1, 14 (1973) (holding

person has no reasonable expectation of privacy as to physical characteristics which he

or she routinely exposes to public view); *Katz v. United States*, 389 U.S. 347, 351

(1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.").  For example, in *Murphy*, *supra*, the Supreme Court rejected the defendant's argument that he had been subjected to an unconstitutional warrantless search where police, who were investigating the strangulation murder of the defendant's wife, invited the defendant to be interviewed at a police station and then obtained, over the defendant's objection, a scraping of material underneath the defendant's fingernails, in order to match such material with the murder victim's blood type and clothing.  *Murphy*, *supra*, at 292, 296.  Further, in *United States v. Sanders*, 663 F.2d 1, 3 (2d Cir. 1981), the court held that a search at a border crossing of defendant's artificial leg, requiring removal of the leg, was less intrusive than a body cavity search despite the fact that "the exposure of the stump to which the prosthetic device is attached, accompanied by a temporary lack of mobility, constituted an embarrassment . . . . [b]ut done in a medical setting, unaccompanied by exposure of intimate bodily parts, and without physical force, the search here was no more intrusive than [a] strip search . . . and clearly less intrusive than a body-cavity search."  And in *In re Grand Jury Proceedings Involving Vickers*, 38 F.Supp.2d 159, 164-65 (D.N.H. 1998), the court held with regard to a criminal suspects' motion to quash grand jury subpoenas requesting suspects' fingerprints, palm prints, saliva and hair samples, that such suspects "do not enjoy a constitutionally protected privacy interest in their fingerprints."  *See also Gilbert v. California*, 388 U.S. 263, 266-67 (1967) (holding a "mere handwriting exemplar, in contrast to the content of what is written, like the voice or body itself, is an identifying characteristic outside [the Fifth Amendment's] protection.").

To pass constitutional muster under the Fourth Amendment, however, a search or an intrusion on bodily integrity by police must be reasonable, and the Supreme Court has instructed that "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.  In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.  Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted."  *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).  *See Buie*, *supra*, at 325-26 ("in determining reasonableness, we [the Supreme Court] have balanced the intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.") (citing cases).  As relevant to this case, although reasonableness generally is measured by a warrant demonstrating probable cause, *Griffin v. Wisconsin*, 483 U.S. 868 (1987), no case establishes "a *per se* Fourth Amendment requirement, or even a lesser degree of individualized suspicion, when government officials conduct a limited search for the purpose of ascertaining and recording the identity of a person who is lawfully confined to prison."  *Jones v. Murray*, 962 F.2d 302, 306 (4th Cir.), *cert. denied*, 506 U.S. 977 (1992).  Indeed, it is well-established that limited intrusions upon personal liberty and bodily integrity to advance investigative needs and to protect officers' safety may be predicated upon particularized and individualized suspicion of criminal conduct and do not require a warrant based on probable cause.  *See Buie*, *supra*, 332 ("there is "no ready test for determining reasonableness other than by balancing the need to search . . . against the invasion which the search . . . entails." (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)); *United*

*States v. Villegas*, 928 F.2d 512, 516 (2d Cir. 1991) ("The [law enforcement] agent is said to have a reasonable suspicion when he is in possession of 'specific and articulable facts which, taken together with rational inferences from those facts, reasonable warrant [the] intrusion.'" (quoting *Terry*, *supra*, at 21) (bracketed text added)).

In *Schmerber*, *supra*, the Supreme Court recognized a critical distinction between a search of one's property or papers, and a search of one's person, stating

> *Because we are dealing with intrusions into the human body rather than with state interferences with property relationships or private papers - 'houses, papers, and effect' - we write on a clean slate.  Limitations on the kinds of property which may be seized under warrant, as distinct from the procedures for search and the permissible scope of search, are not instructive in this context.* We begin with the assumption that once the privilege against self-incrimination has been found not to bar compelled intrusions into the body for blood to be analyzed for alcohol content, the Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions that are <u>not justified in the circumstances</u>, or which are <u>made in an improper manner</u>.

*Schmerber*, *supra*, at 767-68 (italics and underlining added).

Because in *Schmerber*, the administration of the subject blood test involved an intrusion into an area of the body in which the suspect retained a personal security interest or an expectation of privacy, the Fourth Amendment's protection applied and a search warrant issued upon probable cause was required absent some exigent circumstances. *Id*. at 679-70.  As the Supreme Court in *Schmerber* specifically stated

> [t]he interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that desired evidence might be obtained.  In the absence of a clear indication that in fact such evidence will be found, these fundamental human interests require law officers to suffer the risk that such evidence may disappear unless there is an immediate search.

*Id*. at 769-70.

Thus, a determination of whether a particular bodily intrusion is permissible under the

Fourth Amendment requires (1) application of the ordinary Fourth Amendment requirements of a warrant based on probable cause, or an exception to the warrant requirement such as exigent circumstances, and (2) the manner in which the particular intrusive procedure is to be performed must be reasonable.  *Schmerber*, *supra*, at 770-72 (holding that although no warrant was obtained, the involuntary extraction of a blood sample from a defendant accused of driving under the influence of alcohol, while the defendant was hospitalized following an arrest based on probable cause, was a reasonable procedure to measure the defendant's blood-alcohol level and did not violate the defendant's rights under the Fourth Amendment or the Due Process  Clause of the Fourteenth Amendment) (citing *Terry*, *supra*).

Where, however, "the [Supreme] Court has found a lesser expectation of privacy, or where the search involved a minimal intrusion on privacy interests, the Court has held that the Fourth Amendment's protections are correspondingly less stringent." *Winston*, *supra*, at 766-67 (internal citations omitted) (bracketed text added).  *See also Schmerber*, *supra*, at 772 ("the Constitution does not forbid . . . minor intrusions into an individual's body under stringently limited conditions.").  Among those searches that minimally intrude on privacy interests are blood tests, which the Court noted "do not constitute an unduly extensive imposition on an individual's personal privacy and bodily integrity." *Id*. at 762.  In *Winston*, *supra*, the Court, relying on *Schmerber*, held that, despite the existence of probable cause, the court-ordered surgical intrusion into an attempted robbery suspect's left chest area to recover a bullet fired by the victim was unreasonable under the Fourth Amendment given that the proposed surgical procedure would require placing the suspect under general anesthesia, the medical risks to the

suspect were of considerable dispute, and, in light of other available evidence, there

was no compelling need to recover the bullet.  *Id*. at 766-67.  As such, the surgical

extraction of the bullet, even if done pursuant to a court order based on probable cause,

would constitute a violation of the defendant's Fourth Amendment right to a reasonable

expectation of privacy.  *Id*. at 767.

Following *Winston*, the Supreme Court considered the Fourth Amendment's

application to drug and alcohol testing of railroad employees mandated under

regulations of the Federal Railroad Administration ("FRA").  *Skinner v. Railway Labor*

*Executives' Association*, 489 U.S. 602 (1989).  In *Skinner*, the Court, citing *Schmerber*,

stated that "[s]ubjecting a person to a breathalyzer test, which generally requires the

production of alveolar or 'deep lung' breath for chemical analysis, implicates similar

concerns about bodily integrity and . . . should also be deemed a search."  *Skinner*,

*supra*, at 616-17.  The Court continued that although unlike the blood-testing procedure

at issue in *Schmerber*, the FRA regulations for collecting and testing urine samples *"do*

*not entail a surgical intrusion into the body*," although the ensuing chemical urinalysis,

like a blood analysis, "can reveal a host of private medical facts about an employee,

including whether he or she is epileptic, pregnant, or diabetic."  *Id*.  The Court thus

found that the collection and testing of urine and breath samples to be searches within

the meaning of the Fourth Amendment because they intrude on a person's potential

Fourth Amendment interest in preserving one's bodily integrity.  *Id*.

In the instant case, the subject buccal swabs, like the collection of a urine or

breath sample, also "do not entail a surgical intrusion into the body."  *Skinner*, *supra*, at

617.  Furthermore, analysis of one's DNA may reveal many medical facts about the

subject, not only concerning symptoms and diseases with which the subject has been diagnosed, but also the predisposition to developing particular diseases, legitimacy of birth, and, possibly, a predisposition for certain behaviors.  DNA Forensics, *available at* http://www.ornl.gov/sci/techsouces/Human_Genome/elsi/forensics.shtml#5; *see also Skinner*, *supra*, at 617 (observing that chemical analysis of blood and urine can reveal numerous medical facts about the sampled person, "including whether he or she is epileptic, pregnant, or diabetic.").  Nevertheless, that physical media containing human DNA are, by their nature, regularly and involuntarily separated from the person, *e.g.*, saliva, breath, hair, skin tissue, in contrast to blood which is generally not so readily separated from the person in the absence of some trauma, or urine which is generally privately voided from the body at will, or a foreign object like a bullet that can only be retrieved through surgical intervention, a seizure of such DNA carrying bodily elements requires a "clean slate," *Schmerber*, *supra*, at 768, analysis as to what constitutional protections, if any, apply.

While many courts have either found or assumed that the Fourth Amendment's prohibition against unreasonable searches and seizures applies to the taking of a DNA sample from a criminal suspect, not all courts agree that there exists a reasonable expectation of privacy in one's DNA.  In particular, at least one district court within the Second Circuit has noted, in the context of rejecting a challenge by a prison inmate that New York's offender DNA-database statute, N.Y. Exec. Law § 995 *et seq*. (McKinney 1999), violated their Fourth Amendment rights, that

> [n]o one would claim that the collection of skin flaked off by the body would constitute a search - even though such would contain DNA.  Nor would the review of what has been dumped into the garbage be considered a search.

*Nicholas v. Goord*, 2004 WL 1432533, *2 and n. 4 (S.D.N.Y. June 24, 2004) (citing *California v. Greenwood*, 486 U.S. 35, 40-41 (1988) (no privacy interest in garbage placed at curb for collection)).

The Second Circuit, however, in *dicta*, rejected the district court's "*sua sponte* suggestion that the Fourth Amendment might not apply to New York's DNA statute because plaintiffs might not have a reasonable expectation of privacy in their DNA," relying on the fact that sister circuits have consistently found that "prisoner DNA extraction is subject to the Fourth Amendment."  *Nicholas v. Goord*, 430 F.3d 652, 658 (2d Cir. 2005) (citing *United States v. Sczubelek*, 402 F.3d 175, 182 (3d Cir. 2005); *Padgett v. Donald*, 401 F.3d 1273, 1277 (3d Cir. 2005); *United States v. Kincade*, 379 F.3d 813, 821 n. 15 (9th Cir. 2004); *Green v. Berge*, 354 F.3d 675, 676 (7th Cir. 2004); *Groceman v. Department of Justice*, 354 F.3d 411 (5th Cir. 2004); *Boling v. Romer*, 101 F.3d 1336 (10th Cir. 1997); and *Jones*, *supra*, at 306.  Unlike the instant case, where Defendant is challenging the taking of his DNA sample to determine whether Defendant's DNA matches the DNA recovered from the articles of clothing found during the following investigation of the bank robbery, at issue in each of the cases on which the Second Circuit relies was the constitutionality of a state statute authorizing the compelled extraction of DNA samples from convicted persons for storage in a DNA data base for use in solving future crimes.[5]

---

[5] The cases on which the Second Circuit relies are also factually distinguishable from the instant case, either because the government had conceded that the compelled extraction of a DNA sample constituted a search under the Fourth Amendment and, thus, the court did not further consider the issue, *Sczubelek*, *supra*, at 182; and *Padgett*, *supra*, at 1277, or the court without any explanation or discussion of the rationale for such conclusion, simply presumed that the taking of a DNA sample for use in a DNA database constituted a search under the Fourth Amendment.  *Kincade*, *supra*, at 821 n. 15; *Green*, *supra*, at 676; and *Groceman*, *supra*, at 413.  Following a somewhat different approach, in both *Boling*, *supra*, and *Jones*, *supra*, the courts took notice of the fact that the individuals from whom such sample were sought were incarcerated, rather than persons at liberty.  *Boling*, *supra*, at 1340; *Jones*, *supra*, at 306.

Similarly, the cases on which Defendant relies in support of its position, including *Schmerber*, *supra*; *United States v. Noble*, 433 F.Supp.2d 129 (D. Me. 2006); *United States v. Nicolosi*, 885 F. Supp. 50 (E.D.N.Y. 1995); and *Henry v. Ryan*, 775 F.Supp. 247 (N.D.Ill. 1991); Defendant's Memorandum at 5-6, are not dispositive of the question presented on Defendant's motion.  As discussed, at issue in *Schmerber*, *supra*, was whether the withdrawal of blood to determine the alcohol content in connection with the defendant's arrest for driving while under the influence of alcohol constituted a "search" of the defendant's person.  *Schmerber*, *supra*, at 767.  As discussed, Discussion, *supra*, at 17-18, the Supreme Court, noting that the police had probable cause to believe the blood sample would reveal evidence of the defendant's DWI offense, held that the officer's choice of procedure to obtain such evidence was reasonable under the circumstances and no warrant was required.  In *Noble*, *supra*, the government sought a court order to involuntarily detain two witnesses in an arson investigation so as to take DNA samples and fingerprints for comparison with evidence at the scene of the arson. *Noble*, *supra*, at 131-36.  The court refused to order the witnesses' detention so as to obtain DNA samples not because the request was constitutionally infirm, but because analysis of the DNA samples would, at most, merely corroborate the witnesses' story that they were with the arson suspects following the fire, but would not yield any evidence of the suspects' involvement in the arson.  *Id*. at 137.  Thus, the court did not find a need for probable cause, or any alternative, constitutionally required showing, to obtain a suspect's DNA.

In *Nicolosi*, *supra*, the defendant, indicted by a federal grand jury with sending communications through the mails in violation of federal law, moved to quash a

subpoena issued by the district court directing defendant to provide a saliva sample for

DNA analysis and comparison with other evidence of the charged crime.  *Nicolosi*,

*supra*, at 51-52.  The court, without citation to any authority, speculated on how "[t]he

variety of items of physical evidence which law enforcement officials might seek from an

individual's person can best be thought of along a continuum."  *Id*. at 55.  At one end of

this purported continuum, the court placed items "outwardly manifested and in the public

domain," including voice, hair and handwriting samples, and observed that "[o]btaining

these samples does not implicate any privacy or personal dignity interests and can be

affected without a full Fourth Amendment procedure."  *Id*.  Toward the middle of the

continuum, the court placed breath sample tests, reasoning that although analysis of a

breath sample "cannot disclose information about an individual's genetic identity which

might implicate a privacy interest," it may reveal the presence of certain intoxicants in a

person's system, but the method of obtaining such sample is non-invasive and, thus,

does not "substantially offend human dignity."  *Id*.  At the continuum's far end, the court

placed blood and "presumably other internal fluids which could only be obtained by

extracting them from the body," determining that because such fluids are not in the

public domain, obtaining such samples implicates privacy and dignity interests requiring

"full compliance with Fourth Amendment procedures."  *Id*.  The court concluded that the

subject saliva sample containing the defendant's DNA, like a breath sample, fell within

the middle of the continuum and required a warrant, regardless of whether the sample

was obtained by buccal swab requiring an individual to submit to a limited bodily

intrusion, or by having the subject expectorate into a receptacle, requiring no bodily

intrusion and "the affront to the individual's dignity interest would be minimal, if any."  *Id*.

at 55-56.

Finally, in *Henry*, *supra*, plaintiff, in a § 1983 action, in connection with in a murder investigation, was jailed on contempt charges for failing to comply with a court order that the plaintiff respond to a grand jury subpoena directing the plaintiff to provide blood and saliva samples to enable disclosure of the suspect's DNA.  *Henry*, *supra*, at 249.  In *Henry*, the plaintiff was stripped, his clothing was taken away and was placed in an observation cell for eight hours until the plaintiff agreed to provide the blood and saliva samples, after which the plaintiff remained detained, naked in the observation cell for some time prior to being released.  *Id*.  Despite giving the DNA samples, the plaintiff was never arrested, charged or indicted in connection with the murder.  *Id*. at 250. Although the court held that the compulsory extraction of the plaintiff's blood and saliva samples constituted a search within the meaning of the Fourth Amendment, the court held that only "individualized suspicion," rather than probable cause, was required for the order, *id*. at 253-54, but that such suspicion was nevertheless absent given that the grand jury was never advised that the plaintiff was a suspect.  *Id*. at 254-55.  No further rationale for finding an absence of individualized suspicion in the case was offered by the court.

The cases cited by the Second Circuit in *Nicholas*, *supra*, 430 F.3d, and relied on by Defendant, thus overlook the critical fact that one's DNA routinely is held out to the public, especially because of the naturally occurring separation of human cells from a person's body from which DNA evidence may be obtained, somewhat analogous to a fingerprint randomly left on a surface by a suspect.  Thus, it is possible that a sample of Defendant's DNA could have been obtained from a hair from a grooming instrument,

such as a comb or brush, or from saliva on a toothbrush, cup or eating utensil used, or

an article of clothing worn by Defendant containing some skin flakes or perspiration

while incarcerated, or from a routine urine sample given in connection with a prison drug

detection policy.  Defendant does not contend that such a seizure of such physical

media containing Defendant's DNA would require probable cause.  Nor does the taking

of a DNA sample by buccal swab of saliva within Defendant's mouth involve any

penetration of the skin, as does the taking of a blood sample.

Furthermore, the Supreme Court has recognized that there are situations in

which a suspect may be detained, absent probable cause, to obtain personal identifying

evidence such as fingerprints.  *Hayes v. Florida*, 470 U.S. 811, 814 (1985) ("under

narrowly confined circumstances, a detention for fingerprinting on less than probable

cause might comply with the Fourth Amendment").  In particular, in Hayes, the Court

stated that although the forcible removal and transporting of a person from his home to

the police station for investigative purposes including fingerprinting, without probable

cause, warrant or judicial authorization for such detention, violated the person's Fourth

and Fourteenth Amendment rights as to the seizure of his person, such circumstances

did not imply that

> a brief detention *in the field* for the purpose of fingerprinting, where there is only *reasonable suspicion not amounting to probable cause*, is necessarily impermissible under the Fourth Amendment. . . [and] there is support in our cases for the view that the Fourth Amendment would permit seizures for the purpose of fingerprinting, if there is reasonable suspicion that the suspect has committed a criminal act, if there is a reasonable basis for believing that fingerprinting will establish or negate the suspect's connection with that crime, and if the procedure is carried out with dispatch."

*Hayes*, *supra*, at 816-17 (italics added).

*See also Davis v. Mississippi*, 394 U.S. 721, 727-28 (1969)(holding that fingerprint evidence, like any other evidence, is inadmissible under the fruit-of-the-poisonous tree doctrine, if seized in violation of the Constitution).  Significantly, however, neither *Hayes*, *supra*, *Davis*, *supra*, nor any other Supreme Court case, holds that there is a privacy interest in one's fingerprints.  *See also*, *Murphy*, *supra*, at 295 (no Fourth Amendment protection for fingernail scrapings).  Rather, in *Davis*, the Court stated that although the initial seizure of the defendant, during which his fingerprints were obtained, was unlawful and required suppression of fingerprint evidence on that basis alone, "fingerprinting involves none of the probing into an individual's private life and thoughts that marks and interrogation or search."  *Id*.  *Accord Hayes*, *supra*.

In fact, as relevant to the instant case, in *Nicholas*, *supra*, 430 F.3d, the Second Circuit also recognized that incarcerated persons have a reduced expectation of privacy, including bodily privacy given that such privacy rights may be "limited by institutional and security concerns."  *Nicholas*, *supra*, 430 F.2d at 658.  See *also Boling*, *supra*, at 1340("that obtaining and analyzing the DNA or saliva of an inmate convicted of a sex offense is a search and seizure implicating Fourth Amendment concerns, it is a reasonable search and seizure.  This is so in light of an inmate's diminished privacy rights, the minimal intrusion of saliva and blood tests; and the legitimate government interest in the investigation and prosecution of unsolved and future criminal acts in a manner not significantly different from the use of fingerprints."); *Jones*, *supra*, at 306 ("[i]t appears to be established, *at least with respect to free persons*, that the bodily intrusion resulting from taking a blood sample constitutes a search within the scope of the Fourth Amendment," but "when a suspect is arrested upon probable cause, his

identification becomes a matter of legitimate state interest and he can hardly claim privacy in it.") (italics added).

In the instant case, given that Defendant was already in custody when the subject DNA samples were taken, Defendant's liberty interest in remaining free, and thereby avoiding giving an involuntary DNA sample, is not at issue, nor did the manner of taking of Defendant's DNA sample involve any "probing into an individual's private life and thoughts that marks and interrogation or search." *Davis*, *supra*, at 727-28.  As such, in the absence of a Supreme Court or Second Circuit holding on point, the court turns to whether the judicial authorization of the taking of Defendant's DNA sample based only on reasonable individualized suspicion short of probable cause was, in the circumstances presented, a sufficient safeguard of Defendant's Fourth Amendment right to security of his person or a reasonable expectation of privacy.

The Supreme Court has instructed that "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." *Hudson v. Palmer*, 468 U.S. 517, 526 (1984).  Specifically, the Supreme Court stated that

> society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell and that, accordingly, the Fourth Amendment prescription against unreasonable searches does not apply within the confines of the prison cell.

*Id*. at 525-26.

Consistent with *Hudson*, the Second Circuit has held that "prisoners have no legitimate expectation of privacy and [ ] the Fourth Amendment's prohibition on unreasonable searches does not apply in prison cells."  *Willis v. Artuz*, 301 F.3d 65, 67 (2d Cir. 2002).

Significantly, at issue in *Willis*, *supra*, was whether prison officials violated a state prisoner's civil rights under the Fourth Amendment by conducting a warrantless search of the prisoner's cell, at the behest of police seeking evidence of an uncharged crime, and which served no purpose related to prison security.  *Id*. at 66.  Relying on *Hudson*, *supra*, the court stated that

> One of the incidents of confinement for a convict is the loss of privacy, which serves the legitimate purpose of retribution as well as the institutional security needs of the prison system.  We therefore hold that "society is not prepared to recognize as legitimate any subjective expectation of privacy that a [convict] might have in his prison cell."

*Id*. at 69 (quoting Hudson, *supra*, at 526) (bracketed text in original).

Nevertheless, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution."  *Turner v. Safley*, 482 U.S. 78, 84 (1987).  Rather, "while inmates may lose many of their freedoms at the prison gate, they retain 'those rights [that are] not fundamentally inconsistent with imprisonment itself, or incompatible with the objectives of incarceration.'" *Covino*, *supra*, at 77 (quoting *Hudson*, *supra*, at 523) (bracketed text in original)).  In particular, the Second Circuit recognizes "inmates do retain a limited right to bodily privacy."  *Covino*, *supra*, at 78 (citing cases).

At issue in *Covino*, *supra*, was whether a prison policy requiring random visual body-cavity searches for contraband was sufficiently related to a legitimate penological interest so as to be constitutional. *Id*. 75-77.  Without specifying the precise limitations of bodily privacy rights retained by prison inmates, the Second Circuit held that the challenged visual body cavity searches were related to legitimate penological interests and denied the inmate's request for a preliminary injunction halting such practice.  *Id*. at 80.

Similarly, the Fourth Amendment's constraint on government conduct generally bars officials from undertaking a search or seizure absent at least individualized suspicion. *Chandler*, *supra*, at 308. As a result, reasonable, individualized suspicion that does not rise to probable cause can justify a search in circumstances presenting less substantial privacy interests when balanced against the public interest in conducting such searches. *See New Jersey v. T.L.O.*, 469 U.S. 325, 345 (1985) (holding in context of student's challenge to constitutionality of public school official's search of student's purse on school premises that Fourth Amendment's prohibition against unreasonable searches and seizures applied to searches conducted by public school officials, but that the subject search did not violate Fourth Amendment because search was justified by school official's reasonable suspicion that student had cigarettes in her purse and had violated school's smoking prohibition). *See also*, *Hayes*, *supra*, at 816-17.

It is significant that "[w]here a careful balancing of governmental and private interests suggests that the public interest is best served by a Fourth Amendment standard of *reasonableness that stops short of probable cause*, [the Supreme Court] ha[s] not hesitated to adopt such a standard." *T.L.O.*, *supra*, at 341 (italics added). In fact, in numerous cases, the Court has recognized the legality of searches and seizures based on suspicions that, while "reasonable," do not rise to the level of probable cause. *Id.* (citing *Delaware v. Prouse*, 440 U.S. 648, 654-55 (1979) (stopping vehicle and detaining driver solely to check driver's license and registration violates Fourth Amendment absent some articulable and reasonable suspicion that motorist is unlicensed, vehicle is unregistered, or that either motorist or vehicle is subject to seizure

for some violation of law);*United States v. Martinez-Fuerte*, 428 U.S. 543 (1976)

(approving vehicle stops at fixed checkpoints for brief questioning, absent any belief that

vehicle contains illegal aliens, are consistent with Fourth Amendment, as was

subsequent selective referral to secondary checkpoint for questioning as to citizenship

and immigration status, even if such referral was based on apparent ethnicity of

occupants); *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975) (approving

border officer's brief stop of vehicle based on officer's belief that vehicle carried illegal

aliens, and request that occupants explain suspicious circumstances, but stating that

further detention or search must be based on probable cause); *Camara v. Municipal

Court*, 387 U.S. 523, 534-39 (1967) (approving warrantless administrative inspection of

residence by municipal health inspector that revealed violation of housing code); and

*Terry v. Ohio*, 392 U.S. 1, 22-23 (1968) (approving limited search - pat down for

weapons - for protection of police officer investigating suspicious behavior of persons

officer reasonably believed to be armed and dangerous)).  *See also Hayes*, *supra*, at

816-17; and *Davis*, *supra*, at 727-28.  The Second Circuit has similarly recognized that

suspicious, articulable grounds falling short of probable cause can support a

warrantless search or seizure depending on the specific circumstances.  *United States

v. Price*, 599 F.2d 494, 499 (2d Cir. 1979) ("Where no articulable grounds for

individualized suspicion are proffered, no individualized stop is justified.  Where

articulable grounds for probable cause are shown, the maximum intrusion of a custodial

arrest is permissible.  Where the articulable facts observed are suspicious, yet fall short

of probable cause, the reasonableness of a particular stop must be gauged by

comparing the degree of the intrusion with the grounds for the suspicion that intrusion is

called for.") (citing *Terry*, *supra*, at 18 n. 15) ("[T]he scope of the particular intrusion, in light of all the exigencies of the case, [should be] a central element in the analysis of reasonableness.")).

The reasonableness of any search is based on a two-part inquiry, including (1) whether the action was "justified at its inception"; and (2) whether the search, as actually conducted, "was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, *supra*, at 20. "[T]he scope of the particular intrusion, in light of all the exigencies of the case, [is] a central element in the analysis of reasonableness." *Terry*, *supra*, at 18 n. 15. In sum, while an uncharged suspect's DNA is not *per se* an aspect of personal privacy entitled to Fourth Amendment protection, seeking such information by obtaining a physical medium, such as a saliva sample, containing a suspect's DNA does intrude on the right to the security of one's person sufficient to attach Fourth Amendment regulation.

In the instant case, the articulable facts provided by the tentative fingerprint identification of Defendant and the fact that Defendant's physical build, race and hair color generally matched the descriptions of the robber given by the bank tellers provided reasonable individualized suspicion that Defendant was the perpetrator of the bank robbery under investigation, thereby justifying the invasion of Defendant's bodily integrity, if not privacy interest, to obtain the DNA sample sought by the investigators. *See T.L.O.*, *supra*, at 341-42; *Price*, *supra*, at 499. Nor was the scope of the particular intrusion, *i.e.*, the taking of the buccal swabs,[6] unreasonable. Moreover, here, the

---

[6] In fact, the taking of buccal swabs does not involve any penetration of the skin, as does the drawing of a blood sample, nor does it force the suspect to perform in front of a law enforcement official a

public's interest was best served by permitting the government to take Defendant's DNA sample based on reasonable, individualized suspicion, as the analysis of such sample will permit the government to determine whether to prosecute Defendant for the crime, or whether to rule out Defendant as the perpetrator and to continue the investigation. *T.L.O.*, *supra*, at 341; *Sczubelek*, *supra*, at 185 (observing DNA is valuable tool both to "promote[ ] increased accuracy in the investigation and prosecution of criminal cases," as well as "to exculpate individuals who are serving sentences of imprisonment for crimes they did not commit."). The taking of the swabs thus was reasonable provided it was conducted in a reasonable manner and in accordance with substantive dues process. Although not specifically raised as a ground to suppress by Defendant, the court finds the manner used by the agents in obtaining the swabs was reasonable under either the Fourth Amendment of the Fifth Amendment due process clause applicable to the Government.

"Due process of law is a summarized constitutional guarantee of respect for those personal immunities which . . . are so rooted in the traditions and conscience of our people as to be ranked as fundamental, or are implicit in the concept of ordered liberty." *Rochin v. California*, 342 U.S. 165, 169 (1952) (internal quotation marks omitted). In *Rochin*, *supra*, the Supreme Court has held that an accused's right to due process under the Fourteenth Amendment was violated where deputy sheriffs acting upon some information that the accused was selling narcotics, entered the accused's dwelling through an open door, forced open the door to the accused's bedroom, and

---

task normally performed in private, such as the taking of a urine sample. As such, the buccal swab procedure is only slightly invasive, and is more comparable to fingerprinting.

forcibly attempted to extract capsules which the accused swallowed, by taking the accused, against his will, to a hospital where, at the direction of one of the officers, a doctor pumped out the accused's stomach, thereby causing the accused to vomit, expelling the capsules. *Rochin*, *supra*, at 169-72. *See also Breithaupt v. Abram*, 352 U.S. 432 (1957) (upholding involuntary blood sample, taken from the defendant while unconscious following accident, in state DWI prosecution on other grounds). Moreover, the use of reasonable force to obtain a DNA sample from a prison inmate has been upheld. *See Williams v. Berge*, 2001 WL 34377346, * 2 (W.D.Wis. Sept. 6, 2001) (holding prison inmate's Fourth Amendment rights were not violated when "full force tactic team" of correctional officers used unspecified force to make inmate give DNA sample and then place inmate in a cell wearing only underwear and socks); and *Sanders v. Coman*, 864 F.Supp. 496, 498-501 (E.D.N.C. 1994) (holding corrections officers' use of force to obtain DNA sample, including "instances of several officers surrounding an inmate while one held his arm still, the spraying of mace, and bending inmates' wrists in a painful manner to induce compliance" did not violate Fourth Amendment or due process). Here, as Defendant did not offer physical resistance, there is no need to determine whether the investigators exceeded their authority under the Fourth Amendment or the Due Process Clause, to apply reasonable force to obtain the sample. *See Murphy*, *supra*, at 292, 296 (upholding fingernail scrapings taken in spite of suspects protests).

In the instant case, the taking of Defendant's DNA evidence by the court-ordered buccal swabs does not offend due process under the Fifth Amendment as applicable to federal agents. First, as stated, Defendant was already in custody, having been

incarcerated on unrelated state charges when the DNA Order was executed in a separate room of the facility, away from the rest of the prison population, with the door closed, and Defendant does not argue otherwise.  As discussed, Discussion, *supra*, at 26-27, Defendant's incarceration negates the need for probable cause or reasonable individualized suspicion to seize Defendant to take the DNA sample and, as well, leaves Defendant with only a limited right to bodily privacy or integrity.[7]

Further, the manner in which the inside of Defendant's cheeks were swabbed, although a physical intrusion into Defendant's mouth, did not require surgical intervention nor posed any perceptible risk to Defendant's health, and Defendant does not contend otherwise.  Nor does Defendant argue that such intrusion resulted in any personal embarrassment, as may be the case where a urine sample is sought under supervision to guard against tampering.  Moreover, Defendant was not randomly selected for the DNA sample; rather, he had already been identified as a possible suspect based on the preliminary fingerprint analysis and victim descriptions.  Finally, nothing in the record suggests other than that Defendant acquiesced, albeit not a consent to search so as to avoid Fourth Amendment scrutiny, in the swabbings, and did not resist or otherwise attempt to refuse to cooperate in the procedure.  Under these conditions, the method and manner in which Defendant's DNA sample was taken did not violate due process.  *See Rochin*, *supra*.

In light of the foregoing analysis, the Fourth Amendment provides protection

---

[7] Because Defendant was in custody, the court need not consider whether obtaining his presence to facilitate the sampling procedure, had he been residing in his home, would have required a warrant based on probable cause.  *See Payton v. New York*, 445 U.S. 573 (1980) (requiring warrant to enter home to seize suspect ).

against official discovery of one's DNA only when body parts, fragment or fluid from which the sample is obtained remains attached to the suspect's body but, once the physical medium containing the DNA has separated from the suspect's body, no warrant or court order, whether based on probable cause or reasonable individualized suspicion, is required to obtain a sample.  Furthermore, given Defendant's incarcerated status, he was afforded only a limited Fourth Amendment right to bodily security or privacy, requiring less than probable cause, to obtain his DNA sample, provided the request for such sample was justified by such suspicion, and the manner by which Defendant's DNA sample was obtained was reasonable consistent with Fourth Amendment requirements.[8]   Nor did the particular manner in which Defendant's DNA sample was taken violate due process as protected by the Fifth Amendment.  As such, Defendant's motion to suppress the DNA evidence should be DENIED.

### 3.      Probable Cause

Should Chief Judge Arcara disagree with the recommendation that probable cause was not necessary to support the court order authorizing the taking of a DNA sample from Defendant, the court also addresses whether the evidence presented in support of the order established probable cause.  Preliminarily, the gravamen of Defendant's argument is that the Government, by failing to have the preliminary fingerprint analysis results that "tentatively identified" Defendant as a "possible" match

---

[8] Because Chief Judge Arcara properly ordered the swabbings based on a reasonable particularized suspicion, the court need not address whether such an order or warrant was required.  *See Hayes*, *supra*, at 816-17 (implying such an order would be unnecessary to obtain a suspect's fingerprints); *Davis*, *supra*, at 727-28 (same).  *See also Murphy*, *supra*, at 296 (upholding involuntary taking of fingernail scraping without judicial authorization where investigators had reasonable particularized suspicion).

"reviewed and confirmed by a qualified latent examiner," and failing to mention an alleged discrepancy between Defendant's height of 6' and weight of 160 pounds and the descriptions of the bank robber given by the victim and witness tellers as 5' 8" tall and 135 to 140 pounds, relied on false information and acted with reckless disregard for the truth so as to mislead the court into issuing the order.

In determining whether probable cause for a search warrant exists, the issuing judicial officer is simply to make a practical common sense decision whether, given the "totality of the circumstances" set forth in the affidavit in support of a warrant, including the veracity and basis of knowledge of persons supplying hearsay information, there is a *fair probability* that contraband or evidence of a crime will be found in a particular place. *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983) (italics added).  An issuing judge's determination of probable cause will be upheld if he had a "substantial basis for concluding that a search would uncover evidence of wrongdoing." *Gates*, 462 U.S. at 236.  An affidavit in support of an application for a search warrant demonstrates a proper showing of probable cause when it sets forth facts which are sufficient to induce a reasonably prudent person to believe that a search of the areas described within the warrant will uncover evidence of a crime. *Berger v. New York*, 388 U.S. 41, 55 (1967).

Significantly, a judge's determination of probable cause should be given great deference by a reviewing court. *Gates*, 462 U.S. at 236; *United States v. Nichols*, 912 F.2d 598, 602 (2d Cir. 1990).  The resolution of marginal cases should be determined with regard to the preference accorded to warrants. *Jones v. United States*, 362 U.S. 257, 270 (1960).  In assessing a probable cause determination, "[t]he only questions for the Court are whether the [affiant's] reliance on that informant was reasonable, and

whether the Magistrate was fully informed of all necessary facts when she made her finding of probable cause for the issuance of the search warrant." *United States v. Smith*, 9 F.3d 1007, 1013 (2d Cir. 1993).

In the instant case, Defendant urges the court to suppress evidence seized DNA evidence obtained from two buccal swabs of his cheeks on the basis that the evidence presented in support of the DNA Order failed to establish the requisite probable cause. Defendant's Memorandum at 6-7.  There is no merit to this contention.

The record establishes that fingerprint analysis of the latent fingerprint from the victim teller's window counter tentatively identified Defendant as a "'possible' candidate," while no "positive identification" could be made as to two other suspects.   SAFIS Manager Tarnawskyj Memorandum.  That the "tentative identification" of Defendant was never "reviewed and confirmed by a qualified latent examiner," as Tarnawskyj recommended, does not negate the fact that Defendant was, based on the fingerprint lifted from the victim teller's window counter, positively identified as a match.

As to the discrepancy between Defendant's actual height of six feet and the bank tellers' descriptions of the robber as 5' 8" tall, there is no dispute that Defendant, at six feet and 160 pounds, has a slim built, which is consistent with both bank tellers' descriptions.  Furthermore, height discrepancies in excess of four inches have been held not significant when considering the circumstances under which a defendant was viewed.  Numerous factors could have impeded the tellers' more exact estimation of the bank robber's height, including the fact that the bank robber's hood was pulled up over his head, that a counter separated the bank robber from the tellers.  The tellers may have been distracted by the fact that a crime was taking place, and the bank robber

may have been slouching or standing at an angle, rendering estimation of his height more difficult.  *See*, *e.g., United States v. Wong*, 40 F.3d 1347, 1359 (2d Cir. 1994) (witness's in-court identification of defendant reliable despite seven-inch discrepancy between witness's initial description of perpetrator as 5' 7" and defendant's actual height of 6' 2", given that witness initially observed perpetrator crouching in shooting position, "rendering misestimation of his height understandable without significantly undercutting the reliability of [witness's] identification.").  As such, the discrepancy between the bank robber's height, as estimated by the tellers, and Defendant's actual height, does not require a finding that the DNA Order issued was not based on probable cause.  Rather, the evidence presented in support of the DNA Order shows, at the very least, a *fair probability* that the requested buccal swabs would provide evidence of the bank robbery under investigation.  *Gates*, *supra*, at 238-39.

Defendant's motion to suppress on the basis that the DNA Order was not based on probable cause should be DENIED.


**4.     Good Faith Exception**

Even if the DNA Order was issued without probable cause, the good faith exception to the warrant requirement applies.  The exclusionary rule barring illegally obtained evidence does not apply to evidence seized in "objectively reasonable" reliance on a warrant issued by a detached and neutral judicial official, even where the warrant is subsequently deemed invalid.  *United States v. Leon,* 468 U.S. 897, 926 (1984).  "The test of objective good faith is 'whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'"

*United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992) (quoting *Leon*, *supra*, at 922 n. 23).

The good faith exception does not apply in certain situations, including (1) where the issuing judge has been knowingly misled; (2) where the judicial role was wholly abandoned by the issuing judge; (3) where the search warrant application is so lacking in indicia of probable cause as to render reliance on it unreasonable; or (4) where the warrant is so facially deficient that the executing agent's reliance on it is unreasonable. *Leon*, *supra*, at 923.

Even assuming that the Kresse Affidavit failed to establish the requisite probable cause for the DNA Order, the DNA evidence obtained as a result of the execution of the DNA Order warrant should be admitted because the agents relied in good faith on Chief Judge Arcara's order, and Defendant fails to demonstrate otherwise.  Specifically, nothing in the record suggests that the circumstances under which the DNA Order was issued resembles any of the four situations in which the Supreme Court has held the good faith exception inapplicable.  *See Leon*, *supra*, at 923.

First, as discussed, Discussion, *infra*, at 42-44, there is nothing to suggest that anything within the Kresse Affidavit recklessly or deliberately misled the court in seeking the DNA Order.  In particular, the Government consistently maintained that "reasonable individualized suspicion" rather than "probable cause" was the applicable standard for the DNA Order, cited several cases in support of this position and stated, correctly, that the Second Circuit had yet to address the issue.  DNA Memorandum at 6-7.  Although a number of the cases the Government cited as supporting "reasonable individualized suspicion" as the applicable standard of proof for the DNA Order concerned grand jury

subpoenas for obtaining DNA samples, the only case cited by either side in which the government sought to obtain a DNA sample from a criminal suspect, *i.e.*, *United States v. Noble*, 433 F.Supp.2d 129 (D. Me. 2006), was not decided until June 13, 2006, almost three years <u>after</u> the Government sought the DNA Order on August 25, 2003, and execution of the DNA Order on October 30, 2003.  Significantly, in *Noble*, *supra*, the court did not reject the proposition that reasonable individualized suspicion was sufficient for such an order; rather, the court observed that "[t]he government has shown no probable cause, *or even reasonable suspicion*, to believe that either [subject of proposed court order directing taking of DNA evidence by buccal swabs] was engaged in criminal activity; to the contrary, it has acknowledged that neither is a suspect in the [subject] arson case."  *Noble*, *supra* at 136 (italics and bracketed text added).  Thus, even in *Noble*, the court declined to reject reasonable suspicions as the required constitutional degree of showing to warrant a court directed taking of a DNA sample. Nor did the Second Circuit decide *Nicholas*, *supra*, 430 F.3d, until November 28, 2005, well after the order at issue in this case.  As such, the requisite showing when the government sought, obtained and executed the DNA Order was, at best, unsettled, and the Government cannot be said to have intentionally misled the court as to the requisite degree of a showing constitutionally required for obtaining the DNA Order.  Whether Chief Judge Arcara agreed with the Government that "reasonable individualized suspicion" was the requisite standard of proof, or found that the Government had established probable cause, nothing supports any finding that the Government intentionally misled the court into issuing the DNA Order.

As to the second situation, there is no basis on which to find Chief Judge Arcara

completely abandoned his judicial role in issuing the DNA Order.  Significantly, Defendant does not argue, or even suggest, otherwise.

Nor does the record establish that the DNA Order application, *i.e.*, the Kresse Affidavit, is so lacking in any indicia of probable cause as to render reliance on it unreasonable, as contemplated by the third good faith exemption exception.  In particular, the failure to mention that the fingerprint analysis results tentatively identifying Defendant as a "possible" candidate were not "reviewed and confirmed by a qualified latent examiner," SAFIS Manager Tarnawskyj Memorandum, does not negate the fact that Defendant was positively identified as a match, while two other suspects were not.  Despite the four inch discrepancy between Defendant's actual height and the bank tellers' estimation of the perpetrator's height, Defendant does not argue that the bank tellers' description of the bank robber as having a "very slim" build is inconsistent with Defendant's actual build.  Furthermore, the bank tellers both described, quite accurately given the circumstances, Defendant as a black male in his mid-twenties and Defendant does not dispute that, having been born on December 3, 1976, Defendant was 26 years old when the bank was robbed on March 26, 2003.

Finally, nothing supports a finding that the warrant is so facially deficient that the executing agents' reliance on it was unreasonable, and Defendant does not argue as much.  As such, the good faith exception to the exclusionary rule would apply and Defendant's motion to suppress on this alternative basis should be DENIED.

**5.    *Franks* hearing**

Defendant asserts that a *Franks* hearing is necessary because the Government

presented false claims in support of the DNA Order.  Defendant's Memorandum at 7.

Defendant particularly challenges as false the Government's assertion in support of the

DNA Order that a fingerprint lifted from the bank was determined to be Defendant's, and

that an eyewitness description of the bank robber matched Defendant.  *Id*.   Defendant

further asserts the Kresse Affidavit supporting the DNA Order contains false statements

that were knowingly presented to the court with reckless disregard for the truth.  *Id*.

According to Defendant, because the Government knew such assertions were false,

they were presented with reckless disregard for the truth.  *Id*. at 9.  As such, Defendant

requests a *Franks* hearing to determine whether the search warrant was issued without

probable cause.  *Id*.  In opposition, the Government challenges Defendant's

characterization of the Government's statement as false as, "at best, speculative

hyperbole," falling short of the requisite showing for a *Franks* hearing.  Government's

Memorandum at 13.

> Under *Franks* and its progeny,
>
> if a search warrant contains a false statement or omission, and the defendant
> makes a substantial preliminary showing (1) that the false statement or omission
> was knowingly and intentionally, or with reckless disregard for the truth, included
> by the government in a search warrant affidavit, (2) that the information was
> material, and (3) that the affidavit's remaining content is insufficient to establish
> probable cause, then the fruits of the search must be suppressed.

*United States v. Bianco*, 998 F.2d 1112, 1125 (2d Cir. 1993) (citing *Franks, supra*, at
155-56), *cert. denied*, 511 U.S. 1069 (1994).

Specifically, "[a] defendant is entitled to a *Franks* hearing upon a 'substantial preliminary

showing' that the affiant 'knowingly and intentionally, or with reckless disregard for the

truth,' included in the affidavit a false statement *necessary to the finding of probable

cause*."  *United States v. Millar*, 79 F.3d 338, 342 (2d Cir. 1996) (italics added) (quoting

*Franks, supra*, at 155-56).

Before a defendant is entitled to a hearing to test the truthfulness of a warrant's underlying affidavits, however, the "defendant must make a 'substantial preliminary showing' that: (1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the judge's probable cause finding." *United States v. Salameh*, 152 F.3d 88, 113 (2d Cir. 1998) (citing *United States v. Levasseur*, 816 F.2d 37, 43 (2d Cir. 1987)).  Although an affidavit in support of a search warrant application may contain both lawful and tainted allegations, a search warrant issued on the basis of such affidavit remains valid if probable cause is found based on an independent consideration of only the undisputed information contained in the affidavit.  *Franks, supra*, at 170-71; *United States v. Ferguson*, 758 F.2d 843, 849 (2d Cir.), *cert. denied*, 474 U.S. 841 (1985).

"Unsupported conclusory allegations of falsehood or material omission cannot support a *Franks* challenge; to mandate a hearing, the plaintiff must make specific allegations accompanied by an offer of proof." *Velardi v. Walsh*, 40 F.3d 569, 573 (2d Cir. 1994) (citing *Franks, supra*, at 171).  Furthermore, "[a]llegations that amount to negligence or innocent mistake do not constitute the required showing.  The focus is not on whether a mistake was made, but rather on the intention behind the mistake." *United States v. Markey*, 131 F.Supp.2d 316, 324 (D.Conn. 2001), *aff'd sub nom. United States v. Simpson*, 69 Fed. Appx. 492 (2d Cir. 2003) (table).

Here, the record establishes that Defendant particularly challenges the Government's assertions that the latent fingerprint from the victim teller's window

counter "was determined to belong to [Defendant] Aaron Owens," Kresse Affidavit ¶ 7; *see* DNA Memorandum at 2 ("That fingerprint was determined to belong to an individual by the name of Aaron Owens"),  and that Defendant "meets the description of the bank robber given by the victim teller, namely a black male in his mid-twenties, of similar height and weight."  Kresse Affidavit ¶ 8; *see* DNA Memorandum at 2 (stating same). According to Defendant, the Government's assertion that Defendant's fingerprint was found near the victim teller's window is false because although SAFIS Manager Tarnawskyj stated that the "tentative identification" of Defendant " as a possible match based on the counter print should be reviewed and confirmed by a qualified latent examiner," SAFIS Manager Tarnawskyj Memorandum, no such further examination was ever made.  Defendant's Memorandum at 8.  Defendant further challenges as false the Government's assertion that the descriptions of the bank robber provided by both the victim and witness tellers matched Defendant with regard to age and build insofar as the Government failed to mention the discrepancy between Defendant's height of 6' and weight of 160 pounds and the descriptions of the bank robber given by the victim and witness tellers as 5' 8" tall and weighing 135 to 140 pounds.  Defendant's Memorandum at 8.   Upon reviewing the evidence submitted in support of the DNA Order, the court finds that no *Franks* hearing is necessary.  Specifically, the Government's assertion that the a latent fingerprint found at the victim teller's window "was determined to belong to [Defendant]," Kresse Affidavit ¶ 7, is not inconsistent with SAFIS Manager Tarnawskyj's statement that the fingerprint was a "tentative identification."  SAFIS Manager Tarnawakyj Memorandum.  Further, Tarnawakyj's statement that "a positive identification could NOT be made" as to the other suspects for whom the fingerprint was

compared, *id*. (capitalization in original), establishes that as to Defendant, the fingerprint identification was positive, supporting the Government's assertion that the fingerprint "was determined to belong to [Defendant]."  Kresse Affidavit ¶ 7.

Nor was the Government's representation that Defendant "meets the description of the bank robber given by the victim teller, namely a black male in his mid-twenties, of similar height and weight," Kresse Affidavit ¶ 8, materially false.  Although the Government did not mention the discrepancy between Defendant's height of 6' and weight of 160 pounds and the tellers' descriptions of the bank robber as 5' 8" tall and weighing 135 to 140 pounds, there is no dispute that Defendant, given his height and weight, has a very slim build, and like the robber's estimated age was in his mid-20s, general physical attributes consistent with the descriptions provided by the tellers.  As discussed, Discussion, *supra*, at 26-17, numerous factors present during the robbery could have impeded the tellers' more accurate estimation of the bank robber's height. *See Wong*, *supra*, at 1359.  Accordingly, the discrepancy between the estimation of the bank robber's height and weight provided by the victim and witness tellers and Defendant's actual height and weight does not establish that the Government's assertion that Defendant is "of similar height and weight" as the bank robber was materially false.  Rather, Defendant's height and weight establish that his build is, in fact, "very slim," and thus generally consistent with the bank tellers' descriptions.

At most, any inconsistencies made by the Government in support of the DNA Order are nothing more than "negligence or innocent mistake" which do not constitute the requisite showing for a *Franks* hearing.  *Markey*, *supra*, at 324.  As such, Defendant's request for a *Franks* hearing is DENIED.

## **CONCLUSION**

Based on the foregoing, Defendant's motion to suppress (Doc. No. 15) should be

DENIED without a *Franks* hearing.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:     November  27, 2006
            Buffalo, New York

Pursuant to 28 U.S.C. §636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited*, 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Government and the Defendant.

SO ORDERED.

/s/ *Leslie G. Foschio*
_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE


DATED:      November 27, 2006
            Buffalo, New York